# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| James Phillip Daniels,<br><br>    Plaintiff,<br><br>vs.<br><br>Nancy Berryhill, Acting Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 4:18-174-RMG<br><br>**ORDER** |

Plaintiff has brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying his application for child insurance benefits based upon disability. In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 DSC, this matter was referred to a United States Magistrate Judge for pre-trial handling. The Magistrate Judge issued a Report and Recommendation ("R & R") on May 31, 2019 recommending that the Court affirm the decision of the Commissioner. (Dkt. No. 15). Plaintiff filed objections to the R & R, arguing that the opinions of Plaintiff's treating physicians were not given appropriate weight. (Dkt. No. 17). As set forth more fully below, the Court reverses the decision of the Commissioner and remands this matter to the agency for further action consistent with this Order.

**Legal Standard**

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo*

determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(1).

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance." *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes *de novo* review of the factual circumstances that substitutes the Court's findings of fact for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).

Although the federal court's review role is a limited one, "it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). Further, the Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987).

Under the regulations of the Social Security Administration, the Commissioner is obligated to consider all medical evidence and the opinions of medical sources, including treating physicians. 20 C.F.R. § 404.1545. The regulation, known as the "Treating Physician Rule," imposes a duty on the Commissioner to "evaluate every medical opinion we receive." *Id.* § 404.1527(c). The Commissioner "[g]enerally . . . give[s] more weight to opinions from . . . treating sources" based on the view that "these sources are likely to be the medical professionals

most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* § 404.1527(c)(2). Further, the Commissioner "[g]enerally . . . give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." *Id.* § 404.1527(c)(1).

Under some circumstances, the opinions of the treating physicians are to be accorded controlling weight. Even where the opinions of the treating physicians of the claimant are not accorded controlling weight, the Commissioner is obligated to weigh those opinions in light of a broad range of specifically identified factors, including the examining relationship, the nature and extent of the treatment relationship, supportability of the opinions in the medical record, consistency, and whether the treating physician is a specialist. *Id.* §§ 404.1527(c)(1)-(5). The Commissioner is obligated to weigh the findings and opinions of treating physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions. SSR 96-2P, 61 Fed. Reg. 34490, 34492 (July 2, 1996).

The opinions of non-examining sources and state agency medical consultants must be weighed under the same standards of the Treating Physician Rule, including the source's "medical specialty and expertise . . ., the supporting evidence in the case record, supporting explanations . . . and other factors relevant to the weighing of opinions." *Id.* §§ 404.1527(e)(2)(ii). The Commissioner further pledges that the opinions of non-examining sources will be evaluated on "the degree to which these opinions consider all the pertinent evidence . . ., including the opinions of treating and other examining sources." *Id.* §§

404.1527(c)(3).[1]

## Factual Background

Plaintiff, born on October 27, 1992, applied for child insurance benefits based upon a disability arising from his diagnosis of schizophrenia and claimed an onset date of October 27, 2010. Plaintiff has been treated by Dr. McLeod Gwynette, a board certified Child and Adolescent Psychiatrist and director of the residency training program at the Medical University of South Carolina, who began his treatment of the claimant in December 2009. He continuously provided psychiatric care for Plaintiff over the ensuing seven years, and personally had at least two dozen office visits with the claimant, with the last office note in the record from May 19, 2016. (Tr. 257, 261, 276, 277, 279, 281, 284, 285, 287, 291, 303, 304, 305, 306, 307, 308, 311, 313, 314, 326, 327-28, 341-43, 390, 393, 398).

Dr. Gwynette also completed a number of questionnaires and letters summarizing his treatment, diagnoses and opinions regarding Plaintiff and consistently offered to provide the Social Security Administration additional information if needed. (Tr. 259, 334-338, 339, 378-82, 383). Dr. Gwynette described in these documents and his office notes Plaintiff's illogical thinking, difficulty concentrating, paranoia, irrational fears, delusions, and audio hallucinations, all secondary to his schizophrenia. He opined that Plaintiff's mental illness was exacerbated by stress, which rendered him at "high risk for decompensation in work and work-like settings due to his difficulty in coping with stressors and changes in environment." (Tr. 335, 336, 383, 378,

---

[1] The Commissioner has given notice that she intends to repeal the Treating Physician Rule for all cases filed after March 27, 2017. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (January 18, 2017). Since Plaintiff filed this claim on June 9, 2014, the Treating Physician Rule is in full force and effect.

379, 380). Dr. Gwynette noted that while Plaintiff's mental health symptoms worsened when he was non-compliant in taking his prescribed anti-psychotic medications, he continued to have "breakthrough" incidents of hearing voices one to two times per week even when he took his medications, which caused Plaintiff "significant impairment." (Dkt. No. 339, 341, 383, 389, 392, 394, 398). Dr. Gwynette opined that Plaintiff's chronic mental illness "profoundly impacted the patient's ability to function" and rendered him incapable of working in a competitive environment. (Tr. 336, 339, 380, 383). Plaintiff's family physician, Dr. James Dantzler, shared that same view about Plaintiff's inability to function in the workplace. (Tr. 252).

The record documents the struggles of Plaintiff's family in attempting to manage his chronic mental illness, sometimes resulting in violent confrontations with family members and requiring the intervention of law enforcement or medical personnel. (Tr. 41, 44, 46, 371, 394). These conflicts often arose when his mother sought to supervise and confirm that Plaintiff had taken his anti-psychotic medicine, which he at times resisted because of the unfounded belief that the drugs were somehow tainted or that his mother was attempting to harm him. (Tr. 50, 329). Due to Plaintiff's periodic episodes of decompensation, rapid mood swings, and extreme agitation, Plaintiff's mother told the Social Security staff she does not leave Plaintiff alone with his little brother, fearing he might try to harm him, and has refused to help Plaintiff obtain a driver's license, fearing he might hurt someone in the car. (Tr. 329).

The only contrary views offered in the administrative record involved in-house physicians working with the Social Security Administration who did not examine or treat Plaintiff and reviewed only a limited number of medical records (all before September 15, 2014). They concluded that Plaintiff was not disabled, each providing abbreviated entries in the

administrative record. (Tr. 65, 67, 79, 90-91). Due to their time limited review of the record, these chart reviewing physicians did not have access to and did not review Dr. Gwynette's letters and questionnaire responses that were produced on September 30, 2014, May 19, 2016, or August 30, 2016, or his office notes of January 12, 2015, August 4, 2015, November 3, 2015, and February 9, 2016.[2] These notes and documents, all produced subsequent to the last review by the in-house chart reviewers, provided some of the most detailed and significant information in the record about Plaintiff's chronic mental illness and the effect that his symptoms of illogical thinking, paranoia, delusions, and audio hallucinations had on his capacity to participate in the competitive job market.

An administrative hearing was conducted in this matter on September 8, 2016, at which Plaintiff, his mother, and a vocational expert testified. Plaintiff acknowledged violent incidents with his little brother, mother and stepfather and described hearing voices and having mood swings, even when he took his medicine. (Tr. 40-41, 44, 46, 51). He described his struggles taking courses at the local technical college, ultimately scaling back to just one class at a time because the work was overwhelming. (Tr. 36). His mother testified that Plaintiff could not live on his own because he would not take his medicine. (Tr. 55). A vocational expert testified that, based on a hypothetical from the Administrative Law Judge ("ALJ"), the Plaintiff could handle and perform simple, routine tasks and there were jobs in the national marketplace he could perform. (Tr. 58). However, on cross examination by Plaintiff's counsel, the vocational expert testified that there would be no available jobs if Plaintiff exhibited inappropriate behaviors, had

---

[2] The administrative record specifically states that the chart reviewers did not review any medical opinions. (Tr. 68, 79, 92, 101).

-6-

lapses of attention after 30 minutes, or was off task 15% of the day. (Tr. 59-60).

The ALJ issued an order on February 15, 2017 concluding that Plaintiff could perform the full range of work at all exertional levels so long as the work was limited to simple, routine tasks. (Tr. 19). In reaching that conclusion, the ALJ gave "light weight" to Dr. Gwynette's opinions, claiming that he did not provide specific functional limitations, his treatment notes did not support his opinions, and Plaintiff's attendance at a local technical college demonstrated he could sustain full time work. (Tr. 21-22). He also rejected the opinions of the treating family physician, Dr. Dantzler, on the basis that he was not a psychiatrist and the testimony of Plaintiff's mother because "she is motivated to give supportive testimony in her son's quest for benefits." (Tr. 20, 22). The ALJ gave "great weight" to the opinions of the chart reviewing in-house physicians, since their opinions were allegedly "consistent with the claimant's treatment notes." (Tr. 22). The ALJ did not further discuss the bases of the opinions of these non-examining physicians, provided no information concerning their credentials, training, and experience, and apparently was not aware that they had reviewed no records or opinions after September 15, 2014. The ALJ mentioned in his order no less than six times that many of Plaintiff's most serious symptoms arose during periods of medication non-compliance, but never addressed whether this non-compliance constituted willful acts or were secondary to the claimant's chronic schizophrenia. (Dkt. No. 19, 20, 21, 22). The order of the ALJ became the final decision of the Commissioner, and thereafter the Plaintiff timely filed his appeal to this Court.

## Discussion

1. <u>The ALJ's order plainly violated the most basic provisions of the Treating Physician Rule, providing no articulated weight to the long-term treating and examining relationship and level of specialization of Dr. Gwynette, Plaintiff's treating specialist physician.</u>

The underlying premise of the Treating Physician Rule is that health professionals with hands-on bedside treatment of a patient, particularly those with long treating relationships and medical specialization, have generally more insight, knowledge and expertise in assessing a claimant's condition than one who merely reviews a medical chart. Under those standards, the findings and opinions of Dr. Gwynette should be given heavy if not controlling consideration. During the relevant time period, covering seven years, Dr. Gwynette examined the claimant no less than two dozen times and directed the management of his complex and challenging chronic schizophrenia. Dr. Gwynette's credentials in his area of specialization, Child and Adolescent Psychiatry, are impressive. He holds double board certifications in Adult and Child and Adolescent Psychiatry, is an Associate Professor of Psychiatry at the Medical University of South Carolina, the state's premier teaching center and hospital, and heads the Medical University's psychiatry residency program. None of these credentials or the length and depth of Dr. Gwynette's treatment were given any articulated weight by the ALJ.

Dr. Gwynette provided multiple letters and responses to questionnaires detailing his strongly held opinion that Plaintiff's chronic schizophrenia, which was associated with disordered thinking, difficulty concentrating, paranoia, irrational fears, and audio hallucinations, and his predisposition to decompensate when confronting stress, rendered the claimant incapable of sustaining work in the competitive workplace. (Tr. 336, 339, 380, 383). He stated repeatedly

in correspondence to the Social Security Administration his willingness to provide additional information if needed, an offer that the record indicates was never followed up with by the Social Security Administration staff or the ALJ. (Tr. 259, 339, 383). Contrary to the ALJ's claims, Dr. Gwynette's findings and opinions were supported by treatment records that detailed episodes of decompensation, extreme agitation, and hearing voices, sometimes occurring when the patient was compliant with his medications and sometimes when he was not.[3] (Tr. 335, 341, 343, 393, 389, 394). The ALJ gave Dr. Gwynette's well reasoned and grounded opinions, gathered from years of treatment and the highest professional skills, essentially no weight. (Tr. 21-22). The ALJ also rejected the similar opinions of Plaintiff's treating family physician, Dr. Dantzler, on the basis that he was not a psychiatrist. (Tr. 22).

On the other hand, the ALJ gave great weight to three unnamed in-house medical chart reviewers, whose professional training, credentials and expertise were not disclosed and who completed their brief assessments no later than September 15, 2014. (Tr. 22, 65, 66-67, 89-91). Consequently, they did not review the numerous office notes, opinion letters, questionnaire responses and other records that provided critical details supportive of Dr. Gwynette's findings and opinions. It is hard to imagine a circumstance under the Treating Physician Rule in which the opinion of the specialist treating physician should have been greater weight and the in-house

---

[3] The ALJ contended that Dr. Gwynette's treatment notes did not support his conclusions regarding Plaintiff's inability to sustain work. The ALJ "cherry picked" various office notes indicating that Plaintiff's condition was at some moment relatively stable, which for Plaintiff indicated that he had not recently attacked a family member or required an emergency room visit or intervention by law enforcement. Dr. Gwynette's records note that during fairly regular periods of stress, such as during school exams, and sometimes without any real known origin, Plaintiff could decompensate and become uncontrollable and potentially dangerous. From years of observing Plaintiff's condition and patterns, Dr. Gwynette concluded the claimant could not function in the competitive workplace.

chart reviewers given less weight. Essentially, the ALJ turned the Treating Physician Rule on its head, giving great weight to the least informed, non-examining reviewers and minimal to no weight to the most knowledgeable and skilled reviewers with hands on examining experience with the claimant.

The ALJ's plain disregard for the controlling standards of the Treating Physician Rule compels the Court to reverse the decision of the Commissioner and remand the matter to the agency to properly apply these standards to the record in this case. In light of the absence of any credible contrary expert opinion in the record that is based upon a review of the full medical record, the Commissioner needs to carefully consider whether the opinions of Dr. Gwynette are not controlling here under the Treating Physician Rule.

    2.    <u>The ALJ's failure to determine whether Plaintiff's non-compliance in taking his medications was a willful act or a manifestation of his his mental illness constitutes legal error.</u>

The ALJ repeatedly mentioned in his order that Plaintiff was periodically non-compliant in taking his anti-psychotic medications and that such non-compliance often worsened his mental health symptoms. Certainly, a claimant's knowing and willful failure to comply with medical treatment can be a basis to deny a disability application under the Social Security Act. However, a determination that a claimant has been non-compliant does not end the analysis. Where a claimant's mental illness is the primary cause of non-compliance, such failure to comply with medical treatment should be recognized as a symptom of the claimant's mental illness and not provide the basis for the denial of disability benefits. In *Pate-Fires v. Astrue*, 564 F. 3d 935, 945-46 (8th Cir. 2009), a widely cited and respected Social Security case on non-compliance arising from mental illness, the Eighth Circuit noted that "noncompliance with psychiatric

medications can be, and usually is, the result of the mental impairment itself, and, therefore, neither willful nor without a justifiable excuse. . . Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." Thus, where an ALJ relies on a claimant's non-compliance with prescription medications to support a denial of a disability claim, the ALJ must include an explanation or discussion of the reasons, supported by the record, for his determination that noncompliance indicates willful conduct.

The ALJ failed to consider this issue at all, simply repeating over and over the fact that the Plaintiff was non-compliant at times in taking his anti-psychotic medication. A review of the record plainly reveals the Plaintiff's non-compliance was a manifestation of the paranoia, disordered thinking, and poor insight associated with his chronic schizophrenia. Plaintiff would sometimes closely examine his medicine, fearing that someone had tainted the medication, and at other times feared that his mother was trying to harm him by providing him the medicine. Despite repeated efforts to explain to him the importance of taking his medication to avoid decompensation, Plaintiff's mother, Angela Green, had to engage in a daily (and often hostile) encounter with her son to make sure he had taken his medicine. (Tr. 50-51, 314, 329, 367, 394). She testified at the administrative hearing that her son could not live on his own because he would simply not take his anti-psychotic medications on his own. (Tr. 55).

The failure of the ALJ to determine whether Plaintiff's non-compliance was a willful act or a manifestation of his mental illness provides a second and independent basis for reversal of the Commissioner's decision. On remand, the ALJ must make a specific factual determination of

-11-

whether Plaintiff's non-compliance was willful, and, if not, this should not be a factor in evaluating the claimant's disability claim.

    3.    <u>The ALJ erred in substituting his medical opinion for that of the treating physician.</u>

It is well recognized that an ALJ may not substitute his medical opinion for those of the medical experts in the record. *Walker v. DOWCP*, 927 F. 2d 181, 184 n. 4 (4th Cir. 1991); *McBrayer v. Sec'y of Health and Human Servs.*, 712 F. 2d 795, 799 (2nd Cir. 1983). In areas requiring the application of medical knowledge, the ALJ may weigh competing opinions or make a determination that the treatment records of the physician do not support the expert's opinions. In giving little or no weight to the opinions of a treating physician, the ALJ must give "good reasons" for rejecting those opinions. SSR 96-2P. What the ALJ cannot do is to "play doctor" and second guess the medical opinion of a treating physician simply on the basis of his lay opinion that the doctor is wrong. *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017); *Clifford v. Apfel*, 227 F. 3d 863, 870 (7th Cir. 2000).

The ALJ here rejected the opinion of the treating medical specialist, Dr. Gwynette, that Plaintiff's mental illness could not withstand or tolerate the daily stress of the workplace. This opinion was formed as a result of years of medical treatment and management and after observing multiple episodes of decompensation, some very violent. The only arguably contrary opinion in the medical record came from non-examining in-house physicians who reviewed only a fraction of the relevant medical record and did not consider the multiple letters and questionnaire responses of the treating physician. Under the Treating Physician Rule, those opinions of the non-examining physicians should have been accorded minimal, if any, weight.

The ALJ gave "great weight" to the opinions of these chart reviewers but did not discuss in any detail the basis of their opinions and reasoning. He hardly could because their review was extremely truncated, limited only to the record before September 15, 2014, and did not address the issue of Plaintiff's potential for decompensation arising from stress in the workplace. This critical issue, whether Plaintiff could tolerate and function in the workplace with his chronic schizophrenia, paranoia, disordered thinking, inability to handle stress, and hearing voices, was addressed only by Dr. Gwynette.

Instead, the ALJ reasoned that because Plaintiff was pursuing an associate's degree at a local technical college he had the capacity to handle the stress of the workplace. (Tr. 21-22). A review of the record on Plaintiff's school attendance hardly supports this conclusion. In January 2011, Plaintiff reported plans to attend technical college as a full time student for a two year associate's degree. (Tr. 285, 289). Over the ensuing five years documented in the record, Plaintiff went from being a full time student to taking one course, with a pattern of decompensatinig in and around the time of final exams. (Tr. 261, 303, 326, 329, 336, 383, 393, 394, 398).

The bottom line is that the Plaintiff's ability to handle the daily stress of the workplace in light of his chronic mental illness involves the application of specialized medical knowledge and skill. This is particularly true regarding the management of schizophrenia, one of the most daunting and challenging areas of medicine. Dr. Gwynette provided such opinions and laid out his reasoning in considerable detail. He also repeatedly offered to speak to Social Security staff if further information was needed, a generous offer that was never accepted. No medical opinion to the contrary addressed this issue. The ALJ's rejection of Dr. Gwynette's opinions on

the basis that if the claimant could attend a technical college he could work amounted to nothing short of "playing doctor" and substituting his uninformed lay opinion for that of a highly skilled treating physician.

The ALJ's substitution of his medical opinion for that of the treating physician constitutes still another independent basis for reversal of the Commissioner's decision. On remand, it is critical that the full record in this matter be evaluated under the Treating Physician Rule and an early determination made whether Dr. Gwynette's opinions should be given controlling weight.

> 4. <u>The ALJ erred in dismissing the highly probative observations and opinions of Plaintiff's mother on the basis that she must be "motiviated to give supportive testimony in her son's quest for benefits."</u>

The Commissioner pledges to consider all evidence, including information from family members, recognizing that they have "special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 (August 9, 2006). Without analyzing the testimony of Plaintiff's mother, Ms. Green, and the information she shared with the Social Security Administration staff, the ALJ, in summary fashion, concluded that the Plaintiff's mother was "motivated to give supportive testimony in her son's quest for benefits." (Tr. 20). If all family testimony was similarly evaluated, none would ever be considered since virtually every family member would be supportive of the claimant's application for disability. The summary dismissal of the mother's testimony violates the Commissioner's pledge to fairly consider and weigh the testimony and evidence provided by family members and constitutes still another legal error requiring reversal and remand.

On remand, the substance of the Ms. Green's testimony and statements to the Social Security Administration staff, particularly her interview of July 30, 2014 (Tr. 329), should be evaluated in light of its consistency with other record evidence, including Dr. Gwynette's office notes and opinions. The Court's review of the record indicates a high level of consistency in the findings and conclusions of the Plaintiff's mother and the treating physicians. Indeed, it is notable that every person with regular personal contact with Plaintiff referenced in the record (his mother, Dr. Gwynette, and Dr. Dantzler) all concluded that Plaintiff's fragile mental condition and propensity to decompensate when faced with any type of stress rendered him disabled from work in the competitive workplace and the only persons who opined that the Plaintiff could sustain work were in-house chart reviewers who have never laid eyes on the claimant and reviewed only a fraction of the relevant medical record.

## Conclusion

Based on the foregoing, the Court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands the matter to the agency for further proceedings consistent with this order.

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Judge

July __1__, 2019
Charleston, South Carolina